**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISON**

ZEN SEIFU

Case No: 1:19-cv-572

     Plaintiff,

    v.

Bowman, M.J.

POSTMASTER GENERAL,
U.S. POSTAL SERVICE,

     Defendant.

**MEMORANDUM OPINION AND ORDER**

Ostensibly proceeding pro se[1] and *in forma pauperis*, Plaintiff Zen Seifu initiated this action against her employer, the U.S. Postal Service. Plaintiff alleges that Defendant has discriminated against her based upon one or more protected classifications and has retaliated against her based upon a prior EEO complaint. The parties have consented to disposition by the undersigned magistrate judge. *See* 28 U.S.C. § 636(c); (Doc. 14). Currently pending before the Court is Defendant's motion for summary judgment. For the reasons that follow, Defendant's motion will be GRANTED.

    **I.**    **Procedural Background**

Administrative exhaustion is a procedural prerequisite to filing an employment discrimination case under Title VII. Prior to filing this lawsuit on July 18, 2019, Plaintiff filed at least two Equal Employment Opportunity ("EEO") complaints, hereafter described

---

[1]Plaintiff retained counsel, Edward J. Felson, for two prior EEO proceedings. Attorney Felson claimed to be appearing on Plaintiff's behalf at her deposition in this case, (*see* Doc. 45 at 62, stating he was entering his appearance "[f]or the purpose of this deposition"), notwithstanding that no formal Notice of Appearance has ever been filed of record. Attorney representation without being admitted of record is specifically **prohibited** by Local Rule 83.3(e). Plaintiff also testified that she did not prepare the complaint alone but "received assistance from an attorney, an attorney friend." (Doc. 45 at 51).

as the "2016 EEO complaint" and the "2018 EEO complaint."  In a bench decision issued

on June 27, 2018, an EEO administrative judge found for Defendant on the merits of all

claims at issue in Plaintiff's 2016 EEO complaint, finding that Plaintiff had not established

retaliation or discrimination on any basis alleged. (Doc. 69-4 at 10).  Plaintiff filed no timely

appeal of that decision; therefore no claims in the 2016 EEO complaint remain at issue in

this federal case.[2] (*See* Doc. 31 at 11, n.5).  However, the 2016 EEO complaint remains

relevant insofar as it constitutes prior protected activity on which Plaintiff bases a

retaliation claim in this lawsuit.

Approximately two months prior to the adverse decision on her 2016 EEO

complaint, Plaintiff filed the 2018 EEO complaint that underlies this federal case. The

2018 EEO complaint alleged that a mostly new set of responsible management officials

("RMOs")[3] had discriminated against Plaintiff based upon her protected class, and

retaliated against her based on her 2016 EEO activity. (Doc. 69-5 at 1).  The 2018 EEO

case was assigned to a new EEO administrative judge.  However, before that judge had

the opportunity to render a decision, Plaintiff filed this lawsuit and requested dismissal of

proceedings relating to her 2018 EEO complaint. In an EEOC Order dated August 28,

2019, the presiding administrative judge granted that request and dismissed its ongoing

proceeding because "[t]he same matters alleged in the above-captioned 470-2019-

00298X, Agency No. 1C-451-0034-18 are the basis of a case that is now pending before

[2]Most of the asserted claims in the 2016 EEO complaint were based upon conduct that occurred in 2015. In Plaintiff's memorandum in opposition to summary judgment, Plaintiff alleges that the EEO administrative judge was biased and that the agency deprived her of her appeal rights.  (Doc. 100 at 3-6).  At this late date, Plaintiff may neither amend the instant federal complaint, nor relitigate the unappealed EEO decision.
[3]Brian Bull was named in both the 2016 and 2018 EEO complaints.  However, in her 2016 EEO complaint, Plaintiff did not initially identify Mr. Bull, and never called him as a witness or provided his name to the agency during discovery. (Doc. 70-3 at 27-28, 35-36).  The administrative judge dismissed claims related to Mr. Bull, but directed the agency to "take a look at Mr. Bull's conduct." (Doc. 70-3 at 34).

a United States District Court and at least 180 days have passed since the filing of the administrative complaint." (Doc. 36-1).[4]

In the instant federal complaint, Plaintiff alleges discrimination based on her race (Black), color (Brown), national origin (Dominican Republic and Ethiopia), sex (Female), and retaliation/prior protected activity.  (Doc. 3).  Five months after filing an answer and well beyond this Court's March 1, 2020 deadline for filing motions directed to the pleadings, Defendant moved to dismiss Plaintiff's federal complaint for failure to state a claim.  The Court denied that motion as untimely.  (Doc. 31).  In the alternative and on the merits, the Court noted that Defendant had asserted the defense of exhaustion but had failed to include any substantive argument. The Court made clear that Defendant could re-argue exhaustion on summary judgment if appropriate.  (Id. at 10-11).

On August 20, 2020, this Court granted a motion by Plaintiff that sought a preliminary determination that Plaintiff had adequately exhausted a claim relating to an April 3, 2019 Notice of Separation/removal.  (Doc. 52).  The Court agreed that the claim was sufficiently exhausted based upon the dismissal of the 2018 EEO complaint. "Because the entire 2018 EEOC proceeding has been dismissed by the EEOC as a duplicate proceeding, no agency decision will be issued on any of the claims included in that proceeding, including the removal [separation] claim." (Doc. 52 at 7 (emphasis added)).  Thus, any claims included in the 2018 EEO complaint were determined to have been exhausted in this Court.

Plaintiff's 2018 EEO complaint alleged that Defendant discriminated and retaliated against her when it: (1) failed to grant her temporary promotions known as "details" on

---

[4]Although the initial 2018 EEO complaint had been pending for more than 180 days, Plaintiff's frequent motions to amend that administrative complaint meant that not all of her claims had been pending for more than 180 days.  (Doc. 52 at 3; see also Doc. 69-8).

multiple occasions; (2) repeatedly disciplined and ultimately terminated her; and (3) inadequately investigated a January 2018 incident that Plaintiff alleges was a workplace assault.  On March 31, 2021, this Court granted summary judgment on all claims relating to the January 2018 incident.[5] (Doc. 72).  The Court denied Defendant's motion as "premature" on Plaintiff's failure-to-promote and disciplinary claims due to discovery issues that were addressed by separate order.  (*See* Doc. 71).

As amended and excluding the "assault" claims, the 2018 EEO complaint included the following failure-to-promote and disciplinary claims:

> 1.      In January 2016, August 2016, December 2016, February 2017, August 2017, September 2017, November 2017 and December 2017, Plaintiff was denied temporary promotions known as details;
>
> 2.      On January 22, 2018, Plaintiff received a Letter of Warning dated January 16, 2018;
>
> 3.      On July 22, 2018, she was instructed via letter to report for an Investigative Interview and on July 22, 2018, and subsequently, on August 17, 2018, she was issued a Notice of Suspension of 7 Days;
>
> 4.      On September 7, 2018, she was scheduled for a Pre-Disciplinary Interview; and
>
> 5.      On April 3, 2019, Plant Manager Glancy issued a Notice of Separation – Non-Disciplinary, separating Plaintiff from her employment effective April 30, 2019 due to her "inability to perform the essential functions of your position," based upon her absence from work for more than a year.

(Doc. 69-7, 10/22/19 Order granting motion to amend).  Plaintiff's federal complaint generally tracks the same allegations and claims, with some notable exceptions.[6]  For

---

[5]Defendant's prior motion for summary judgment was technically its second such motion.  Defendant first moved for summary judgment on August 3, 2020, but that motion was rejected for procedural reasons, without consideration of the merits.  (Docs. 46, 52).

[6]Plaintiff's memorandum in opposition to summary judgment attempts to raise new claims apparently included in an improperly filed "Amended Complaint." The Court declines to address those arguments.

example, Plaintiff additionally alleges in this Court that she was denied a detail on January 13, 2018.[7]

On June 1, 2021, Defendant filed a motion seeking summary judgment on all remaining claims in this federal case.  (Doc. 91).  Plaintiff filed a response in opposition, (Doc. 99), to which Defendant filed a reply, (Doc. 105).  Based upon new issues presented in Defendant's reply, Plaintiff was permitted to file a sur-reply (Doc. 108).

## II.    Standard of Review

In a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted).   "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted).   "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's unsupported allegations.  After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden

---

[7]The dates referenced by Plaintiff in her 2018 EEO Affidavit otherwise correspond with eight of the failure-to-promote claims included in Plaintiff's EEO and federal complaint.  Another variation between the EEO Affidavit and Plaintiff's federal complaint is evident in the list of the RMOs alleged to have ignored her requests for details.  For example, Dave Caproni is included in the EEO Affidavit but not in Plaintiff's complaint in this case, while Mark Wilson, Roosevelt Thompson and John Rachlow were not included in the EEO Affidavit list but are included in her federal complaint.  (*See* Doc. 3 at PageID 20-21).

shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505 (1986). The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52, 106 S.Ct. 2505. To demonstrate a genuine issue of fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

### III. Undisputed Findings of Fact

Beginning in December 2016 through April 2019, Plaintiff was classified as a Career Mail Processing Clerk assigned to work at the Cincinnati, Ohio Network Distribution Center. Plaintiff complains about occasions on which she alleges she was "denied" a type of temporary promotion that is variously described in the record as a "detail" or a "204 B" assignment. Such assignments are non-bargaining unit positions defined as "the placement of an employee into an established position for a limited period of time to perform duties and responsibilities other than those contained in the employee's normal position description." (Doc. 91-1 at 2, Ex. A, Handbook EL-312, Employment and Placement, § 716.12). Both managers and rank-and-file employees may be assigned details, which assignments may include a temporary pay increase commensurate with

the increase in duties.  However, not every postal employee is eligible for every detail assignment.  A Collective Bargaining Agreement ("CBA") between Plaintiff's union, the American Postal Workers Union (APWU) and the United States Postal Service includes certain restrictions in the use of 204 Bs as it pertains to clerks, including Plaintiff's position. (Doc. 75-3 at 2).

Apart from CBA restrictions, there were no "rules, regulations, policies or procedures" to follow and no formal process by which an employee could seek out an appointment to a temporary detail. (*Id*.)  Instead, individual managers exercised discretion on the selection of employees when a detail assignment was available.  If a detail became available, the assigning managers would "[g]enerally… consider and evaluate factors such as the employees' work experience, work performance history, disciplinary actions, attendance history, interpersonal skills, etc." in order to determine which employee to place in the temporary position.  (*Id*.)

For a few years beginning around 2016 and continuing through 2018, Defendant offered an annual Ohio Valley District Career Awareness Conference ("CAC") that employees could attend in order to learn about promotional opportunities.  For a two-week period after each CAC conference, an attendee electronically could submit his/her information for input into a "Leadership Skills Bank," which was a "list of employees who had expressed interest in upward mobility in the Postal Service."  (*Id*.)

Kurt VanderKolk was the Information Systems Manager who was in charge of the Skills Bank Program.  After the submission period closed, Mr. VanderKolk would roll the employees' information into a spreadsheet that he maintained.  (*Id*.)  The Skills Bank Program was eventually discontinued and Mr. VanderKolk retired.  However, Defendant admits that during the years that Skills Bank existed, "[i]t was the expectation that

7

Managers, Postmasters, Installation Heads, etc. would consult the Skills Bank spreadsheet for potential candidates for details into their respective departments." (*Id.*) Plaintiff attended the CAC in 2016 and 2017 and completed Skills Bank submissions/applications both years.[8]

In addition to not being assigned details, Plaintiff complains about what she describes as a series of adverse disciplinary actions, beginning in January 2018 and continuing through April 3, 2019 when she received a Notice of Separation. It is undisputed that Plaintiff was placed into a Leave Without Pay ("LWOP") status on January 11, 2018, when she failed to return to work following a January 2018 incident with a coworker.[9] (Doc. 69-9). Via letter dated March 6, 2019, she was advised that she was being notified she could be terminated from employment for "Unsatisfactory Job Performance" or alternatively, "due to your regular absence from duty." (Doc. 91-3). The March 6, 2019 letter advised Plaintiff that in lieu of termination, she "may wish to consider" a list of options. One of the options was a "return to full-duty with no restrictions by March 18, 2019," but the letter clearly stated that to exercise that option, Plaintiff must "provide us with the medical documentation indicating that you are fit for duty." (*Id.*) In response, Plaintiff stated in a letter dated March 15, 2019:[10]

> I, Zen Seifu, have not been released to come back to work by my medical professional. I expect to see my doctor mid-April 2019 for further notice of my medical condition. Once I am advised by my medical professional on whether I am fit for duty or not I will inform you of the updated prognosis.

(Doc. 91-4 at PageID 4435).

---

[8]Although the record is unclear as to whether Plaintiff submitted her application to the Skills Bank only in 2016 or also after the 2017 CAC, the undersigned construes this factual issue in favor of Plaintiff.
[9]Plaintiff repeatedly refers to the incident as an "assault" and complains that her claim for workers' compensation benefits was wrongfully denied. Plaintiff's worker's compensation claim is not at issue in this lawsuit, and Defendant was granted summary judgment on all issues relating to the January 2018 incident.
[10]Defendant denies receipt of the letter prior to March 17, 2019.

Plaintiff went to the Cincinnati Distribution Center on March 17, 2019 and asked to meet with a Union Steward. After the meeting she stated she would return "in April." (*Id.* at PageID 4433). However, she did not provide the documentation requested at that time, nor did she report to work since she was not medically cleared to return to full duty. (*Id.* at PageID 4436-4437). Instead, Plaintiff provided a series of vague and conclusory letters from Dr. Robinson, a physician with MMA Avondale Internal Medicine, that did not include a diagnosis or other information required by Defendant. For example, Dr. Robinson's October 12, 2018 letter states: "After multiple conversations with Ms. Seifu I have advised her not to return to work for medical reasons. She is to continue current treatment regimen." (*Id.* at PageID 4443; *see also Id.*, at PageID 4444-4446 for similar letters dated 11/16/18, 12/20/19, 1/24/19). For the first time in a fifth letter dated March 7, 2019, Dr. Robinson provided a diagnosis, but no other details. That letter states: "Ms. Seifu has been under the care of her psychiatrist for treatment of PTSD. She has not been able to return to work per her psychiatrist['s] recommendation." (*Id.* at PageID 4447).

On March 18, 2019, Acting Plant Manager Glancy sent Plaintiff a Notice of its intent to separate her from employment "in the near future" due to her continued absence without adequate documentation. Citing Plaintiff's absence since January 11, 2018, the letter states "ELM [Employee and Labor Manual] Section 365.342 states that at the expiration of 1 year of continuous absence without pay, an employee who has been absent because of illness may be separated for disability." (Doc. 91-5, PageID 4448). On April 3, 2019, Glancy issued a final "Notice of Separation – Non-Disciplinary" citing the same ELM provision. The Notice stated that "you will be separated from the Postal Service thirty (30) days from your receipt of this notice." (Doc. 69-10, PageID 2549-2550).

The Notice reiterated it was "not a disciplinary action, but rather,…an administrative action" based upon Plaintiff's extended absence. (*Id.*)

Plaintiff filed separate union grievances over a January 2018 Letter of Warning concerning use of overtime, a 7-day Notice of Suspension concerning her extended absence, and the April 3, 2019 Notice of Separation. In the last grievance, she argued that she was separated before the expiration of the thirty days provided in the Notice. All three grievances were resolved through settlements, with the Letter of Warning and Suspension expunged, (Docs. 97, 103, Undisputed Facts 27, 30), and with Plaintiff reinstated, without back pay, on February 29, 2020.[11]

## IV.    Analysis

Title VII prohibits discrimination and retaliation against federal sector employees under 42 U.S.C. § 2000e-16(a), which states, in relevant part, that "[a]ll personnel actions affecting employees ... in the United States Postal Service and the Postal Regulatory Commission ... shall be made free from any discrimination based on race, color, religion, sex, or national origin." Plaintiff alleges that Defendant both discriminated against her and retaliated against her based upon the failure to promote her to "details" and the allegedly improper disciplinary actions. Because Plaintiff relies only on indirect evidence of discrimination and/or retaliation, her case is governed by the familiar *McDonnell Douglas* burden-shifting framework that applies to most employment discrimination cases. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Although her race and gender discrimination and retaliation claims involve the same "failure-to-promote" allegations and disciplinary actions, the prima facie elements for the two types of claims

---

[11]Defendant has offered evidence of Plaintiff's continuing absences from work after February 29, 2020, but that evidence is not material to any claim presented in this case.

are addressed separately due to slight variations in proof.  As discussed below, Defendant is entitled to summary judgment because Plaintiff has failed to satisfy her initial burden of proof to show either discrimination or retaliation.

Under the *McDonnell Douglas* framework, only if a plaintiff proves her prima facie case does the burden shift to the defendant to offer a legitimate non-retaliatory reason for the actions taken.  If the defendant offers such a reason, then the plaintiff must show that the proffered reason was a pretext for unlawful retaliation.  Here, even if Plaintiff had carried her initial burden, Defendant has articulated legitimate, non-discriminatory reasons for its actions, which Plaintiff has failed to rebut.  Therefore, Defendant is entitled to summary judgment on all claims.

## A.  Procedural Arguments Raised in Defendant's Reply Memorandum

Before turning to Defendant's substantive arguments, the Court addresses three procedural arguments that Defendant raises for the first time in its reply memorandum in support of summary judgment.  Defendant argues: (1) that an "Amended Complaint" filed by Plaintiff on the same day that Defendant moved for summary judgment is improper; (2) that two claims included in Plaintiff's original complaint are unexhausted and therefore should be dismissed; and (3) that seven of Plaintiff's failure-to-promote claims are time-barred.  In order to permit Plaintiff adequate opportunity to respond to the new arguments, the Court granted Plaintiff's motion to file a sur-reply. (Doc. 108).

Although Plaintiff identifies the relevant issues, her sur-reply offers no relevant response.  Instead, she asserts that the "Doctrine of Collateral Estoppel" precludes all new arguments, "because a valid final judgment has been rendered by the EEO Administrative Judge Aaricka Mack-Brown and this Honorable Court."  (Doc. 108 at 3, PageID 5837).  Plaintiff misunderstands the cited legal doctrine.  No final judgment was

entered by the EEO administrative judge in response to the 2018 EEO complaint, and no final judgment has been entered by this Court that would preclude any of the Defendant's new arguments. The first two of Defendant's arguments are well-taken.

### 1. Plaintiff's New "Amended Complaint" is Disallowed

Plaintiff filed an "Amended Complaint" on the same day that Defendant moved for summary judgment on all remaining claims. (Doc. 93). Plaintiff's deadline to amend expired on February 1, 2020. (Docs. 11, 12). For the reasons stated in the separate Order filed herewith, the procedurally improper "Amended Complaint" has been stricken from the record.

### 2. Unexhausted Claims

Defendant additionally argues that two claims – alleging discrimination based upon national origin and a claim alleging denial of a detail on January 13, 2018[12] - are barred from review because Plaintiff did not include either of those claims in her 2018 EEO complaint or in multiple amendments to that complaint. Defendant asserted the exhaustion defense in its answer, as well as in a previous motion to dismiss. This Court previously held that Plaintiff should be deemed to have administratively exhausted only those claims that had been included in her 2018 EEO complaint. (Doc. 72 at 3, citing Doc. 31 at 9). Defendant's new argument takes aim at claims that were not included by Plaintiff in her 2018 EEO complaint. Defendant has not waived this defense, and Plaintiff offers no justification for her failure to include the referenced two claims in her 2018 EEO complaint. Therefore, Defendant is entitled to judgment on the two unexhausted claims.

---

[12](Doc. 3 at ¶23(b)).

### 3. Potentially Time-Barred Failure-to-Promote Detail Claims

In a final new argument presented in its reply memorandum, Defendant argues that seven of the alleged denial of details (January 2016, August 2016, December 2016, February 2017, August 2017, September 2017 and November 2017) should be dismissed as time-barred, because Plaintiff did not file an EEO complaint concerning those claims until well after her 45-day period for filing a complaint had expired, on January 30, 2018. "Each discrete discriminatory act starts a new clock for filing charges." 29 C.F.R. §1614.105(a)(1) (45 days is the deadline to file an EEO complaint in the federal sector). Defendant contends that Plaintiff's claim that she was wrongfully separated from service by the Notice of Separation also is time-barred. Plaintiff did not seek to add the April 3, 2019 Notice of Separation claim to her 2018 EEO proceeding until June 6, 2019, more than 45 days after the Notice issued. (Doc. 69-7 at PageID 2439-2540).

Defendant has never before raised this defense, suggesting that it has been waived. Defendant maintains that waiver should not apply because the EEOC never had the opportunity to consider the issue of timeliness, having dismissed Plaintiff's 2018 EEOC proceeding prior to rending a final decision on the 2018 EEO complaint. But the case that Defendant cites was at the EEOC level, prior to federal suit being filed. *See Estus v. Dept. of Veterans Aff.*, EEOC Appeal No. 01962215 (Feb. 16, 1997). And unlike *Estus*, it is not clear that Defendant here *ever* challenged the timeliness of claims before the EEOC; certainly, it has never before done so in this Court. Given the Defendant's failure to raise this issue at any earlier point in time, the Court declines to consider the new defense.

### B. Defendant is Entitled to Judgment on All Discrimination Claims

In order to prove her prima facie case of discrimination on the basis of race, color

or gender, Plaintiff must show: (1) she is a member of a protected class, (2) she was qualified for her position; (3) she was subjected to an adverse employment action, and (4) she was treated differently than a similarly situated nonprotected person. *Kuhn v. Washtenaw County*, 709 F.3d 612, 624 (6th Cir. 2013) (citing *McDonnell*, 411 U.S. at 802). Defendant concedes that Plaintiff, who alleges that she is a Black female, is a member of a protected class. However, Defendant argues persuasively that Plaintiff cannot establish the other elements of her failure-to-promote or disciplinary claims in order to show discrimination on the basis of her race, color or gender.

### 1.  Plaintiff Cannot Prove Discrimination in Detail Assignments

A denial of even a temporary promotion like a detail assignment can constitute an adverse employment action. However, to prove her failure-to-promote claim, Plaintiff must start by identifying a specific detail assignment that existed, for which she was qualified, applied, and was rejected. This, she has failed to do.[13]

### a.  No Evidence That a Detail was Available

Plaintiff's only written evidence of "application" for any detail is the Skills Bank submission, which was not technically an application for any open position but more a general expression of interest in future promotional opportunities. The Skills Bank was used as a repository of profiles/resumes. (Doc. 75-3, PageID 3671). A submission to the Skills Bank did not guarantee an applicant an assignment to a detail.

On the one hand, Plaintiff's failure to submit a formal written application is not *necessarily* fatal to her claim. In *Dews v. A.B. Dick Co*., 231 F.3d 1016, 1022 (6th Cir. 2000), the Sixth Circuit held that a plaintiff was excused from showing that he submitted

---

[13]It is worth noting that this Court previously acknowledged that Plaintiff had included so few factual allegations to support her failure-to-promote claims that it was "fairly debat[able] whether Plaintiff has alleged sufficient facts to support a plausible disparate treatment claim." (Doc. 31 at 12).

a formal application when no formal process existed. On the record presented, it is clear that no formal application process existed. Instead, RMOs were encouraged (though not required) to review the Skills Bank list prior to making detail assignments whenever an opening might occur in their respective departments.[14]

Still, Defendant is entitled to judgment because Plaintiff has failed to show that any open and available position existed for which she was qualified. *Dews* excuses only the requirement of a formal application in limited circumstances – it does not excuse a plaintiff's failure to show that a specific position was open for which she was qualified, and that was filled by some other candidate. Thus, at a minimum, Plaintiff must point to some evidence from which a reasonable jury could infer that an open and available detail existed. Plaintiff's evidence is limited to her testimony that she electronically filed Skills Bank submissions after attending the annual Career Awareness Conference,[15] and that she had a handful of conversations with various RMOs in which she expressed interest in obtaining unspecified detail assignments on eight or nine separate occasions.

Defendant points to a lack of evidence that any detail positions were filled by any Mail Processing Clerks during any of the time periods in question, as well as a lack of evidence that anyone else was chosen to fill such positions. An employment discrimination claim for failure to promote simply cannot stand absent proof that a position was available and that the employee applied for it." *Storch v. Beacon Hotel Corp*., 788 F. Supp. 960, 965 (E.D .Mich. 1992) (granting partial summary judgment where, despite plaintiff's expressed interest in an assistant general manager position, she failed to show

---

[14]In the Skills Bank, an employee's current classification as well as a list of their skills and interests were compiled into a spreadsheet.
[15](Doc. 45, Plaintiff's depo. at PageID 1276, 1287 ("I only applied August 2016")).

that the position was vacant and available, that she applied, or that any person was ever placed into the position).

To prove that she was denied available positions, Plaintiff relies chiefly on her "EEO Investigative Affidavit" dated June 2, 2018. (Doc. 99-14).[16]  But that Affidavit merely lists the months in which Plaintiff attests she was "denied" details by a short list of RMOs. The Affidavit provides no information about the nature of Plaintiff's requests, the nature of any open and available detail assignments, or when or in what manner the "denials" were conveyed to her.  (*See* Doc. 99-14, PageID 4867). To the contrary, in both her EEO Affidavit and in her deposition, Plaintiff did not testify to any express denials, but instead explained that she subjectively perceived that her requests were being "ignored" because she did not receive any details during the relevant months.  (*See*, *e.g.*, Doc. 99-14, PageID 4868, clarifying in response to inquiry about the reasons(s) provided for "denials," that "I am ignored.").

Apart from her EEO Affidavit, Plaintiff offered limited deposition testimony that she verbally requested details.  But that testimony, summarized below, is as vague as the EEO Affidavit and does not substantiate the availability of any specific detail that was open to Plaintiff.  For each of the detail requests that were "ignored," Plaintiff fails to provide any support for otherwise conclusory allegations that some form of vacant detail position existed.  In contrast to Plaintiff's implicit suggestion that details were open and available during the months in which she made some form of inquiry, Plaintiff's testimony suggests that any available detail position would have been "posted." (See Doc. 45,

---

[16]This Court previously cautioned both parties to specifically identify exhibits filed of record in this case. Plaintiff's references to the exhibits remain confusing at best.  For example, she refers to the document filed as Doc. 99-14 and docketed in this record as "Exhibit Z, Seifu Affidavit," as "Ex. N-1."

Plaintiff's Depo at PageID 1301 ("They post them but you can also inquire in person for your interest in a detail assignment.")).  She has offered no evidence of any such postings.

As for her alleged verbal requests, Plaintiff asserts that the RMOs "responsible for determining qualified applicants for 204B details were Chris Bruno and Jeffrey Knauer." (Doc. 100 at 14, ¶ 40).  However, Chris Bruno and Jeffrey Knauer, along with John Rachlow and Mark Wilson, all have attested that they have no independent recollection of granting or denying any details to any Mail Processing Clerks during the relevant time periods.[17] (*See e.g.,* Doc. 99-9 at 3, Knauer affidavit stating "I was never aware of [plaintiff] wanting a detail within Ohio Valley District").  There is no information that Plaintiff requested details from Brian Bull or Roosevelt Thompson. (Doc. 80-1 at 2).  In addition, the Skills Bank spreadsheet does not show that *any* Mail Processing Clerks received 204-B details granted by Jeffrey Knauer or Chris Bruno during the relevant time periods.  (Doc. 75-3 at 5).  And Plaintiff has not come forward with evidence that *any* specific detail existed for which a Mail Processing Clerk could have been, or actually was, selected during the months in question.

### i.    January, August, and December 2016 Claims

Turning to the months in question in 2016, Plaintiff first alleges that she was denied a detail in January 2016.  However, she had no documents to show that a detail existed, did not know whether or not there was a "posting" about a detail, and could not say that she had submitted any type of "application in January 2016" for any identified open or available detail. (Doc. 45, PageID 1271: 8-19; 1287: 22-24).

---

[17]Reginald Smithson and Chris Smith were retired at the time discovery responses were produced, supplemental responses stated that no information had been received to suggest that they granted or denied any details.  (Doc. 80-1 at 2).

Plaintiff points to a February 2016 email that she claims corroborates her January request "to serve in a 204B detail assignment, preferably in Columbus, Ohio." (Doc. 100 at 11). But the February 17, 2016 email does not show the availability of any particular detail in any department, nor does it memorialize Plaintiff's alleged request for an open and available detail assignment. Rather, the email reflects an exchange between an EEO ADR Specialist concerning a prior workplace complaint by Plaintiff. The email documents Plaintiff's offer to "drop" the unspecified complaint in exchange for a transfer of her existing position to Columbus, Ohio from Cincinnati. In a responsive email to the EEO ADR Specialist, John Rachlow states that he advised Plaintiff that "I didn't have the authority to make that happen." (*See* Doc. 99-15 at 2-3).

Plaintiff admits that the only "application" she submitted in August 2016 was the Skills Bank submission. (Doc. 45, PageID 1272: 10-13). Plaintiff has no evidence that any open and available position existed in August 2016 for which she was qualified.

Plaintiff testified that she spoke with Mark Wilson[18] in December 2016 after hearing from an unidentified person that USPS was "hiring for holiday assistance for a 204B detail assignment." (Doc. 45 at PageID 1288). According to Plaintiff, Wilson told her that "he would get back with me and he never did." (*Id.*) When pressed, Plaintiff testified that "*they* said they will look into it, *they* will talk to, look more into it and I guess talk to whoever *they* need to talk to, to see if *they* could make that opportunity exist." (*Id.* at PageID 1290, emphasis added). Plaintiff never identified who "they" was, and her testimony implies a lack of any available detail at that time.

---

[18]Mr. Wilson was not identified as an RMO who denied her a detail in Plaintiff's EEO Affidavit. There, she asserted that Jeff Knauer was the RMO who denied her a detail in December 2016.

> ii.     **February, August, September, November and December 2017 Claims**

With respect to the failure-to-promote claims alleged to have occurred during five months in 2017, Plaintiff repeatedly testified that she spoke with various managers, often unidentified, about her desire for a detail assignment, but that the decisionmakers indicated that she should speak to someone else with authority or -in some cases - stated they would look into whether any positions were available but did not follow up or get back to her. (*See*, *generally*, Doc. 45, PageID 1293-1295, 1298, 1300). For example, Plaintiff testified that on an undetermined date in February 2017, she was "made aware by a[n unidentified] management official that it's [sic] a detail available and I requested, and I approached Chris Bruno MDO about my interest…"[19] When asked which "management official" told her that a detail was available, for what position or the manner of communication, Plaintiff was equivocal: "I believe it came up in a conversation regarding that it [sic] was not enough supervisors on the floor at that time." She had no recollection of "who brought up the detail position" or if anyone stated that a supervisory detail assignment was actually open and available to be filled by a Mail Processing Clerk. (Doc. 45 at PageID 1293-94).[20]

Plaintiff further testified that in August 2017, she conveyed her interest in future detail assignments to "the district manager" and several "higher officials" while she attended the CAC leadership conference. (Doc. 45 at PageID 1294). She testified she was "made aware by Chris Smith from Columbus that there were detail assignments in

---

[19](*See* Doc. 45 at PageID 1293). Plaintiff's testimony varied from her earlier EEO Affidavit where she stated that Jeff Knauer denied (i.e., "ignored") her request for a detail in February 2017.

[20]Plaintiff subsequently testified that Chris Bruno "did make it aware [sic] that there were detail assignments available," but never got back to Plaintiff in response to her interest. (*Id.*) Even assuming that Plaintiff's paraphrase is sufficient to show that some manager told her that a detail position was available, the reported conversation does not show that Plaintiff was qualified for the "available" assignment.

Columbus that were available" and responded with interest. (*Id*. at PageID 1294-95). Plaintiff testified that she was told "to apply through the [S]kills [B]ank" and that "they would get back with me," but she never received a detail assignment. (*Id.* at PageID 1296). Again, Plaintiff has no evidence that a specific detail assignment in Columbus existed for which a Cincinnati Mail Processing Clerk could have been selected.

In September 2017, Plaintiff testified that Jeff Knauer "was complaining about the mail not being out, and how short he was," and he "would say he was looking for 204Bs and he'll let me know what he hears back or if he can get me on the schedule," but Plaintiff did not hear back. (*Id*. at PageID 1298). Plaintiff later spoke to Chris Bruno in November of 2017 about her September conversation with Knauer, but Bruno also failed to get back to her. (Doc. 45 at PageID 1298-99). She testified that in her conversation with Bruno, she told him she was seeking out a "general 204B position, *whatever they had available*," and not any "particular posting, ID number or nothing." (*Id*. at PageID 1299, emphasis added). Again, she has no evidence that a position was in fact available.

The same result obtains as to Plaintiff's December 2017 failure-to-promote claim, which Plaintiff bases on a conversation with Knauer in which he "mentioned something about me speaking to Brian Bull and him not having the authority to grant that detail assignment." (*Id*. at PageID 1300). Plaintiff chose not to reach out to Bull despite being informed that he would be the decisionmaker for any available detail. She testified she declined to speak to Bull because he had "sexually harassed me" in the past. (*Id*. at PageID 1301). But again, Plaintiff has failed to show any open and available detail.

In sum, neither her Skills Bank submissions nor Plaintiff's testimony is sufficient to carry Plaintiff's burden to show that a particular detail position existed and was available to employees in her classification on any of the referenced occasions in 2016 or 2017.

Plaintiff simply has no evidence that any posted or non-posted detail positions, for which she was qualified, were vacant. *Accord James v. Frank*, 772 F.Supp. 984, 994 (S.D. Ohio 1991) ("More is required than general allegations that James requested but was denied details while some employees received such details. The court cannot infer … discrimination from this paucity of evidence.").   Because Plaintiff has failed to produce any evidence of the existence of an open and available detail assignment, for which she was qualified, on any occasion on which she alleges that she conveyed her interest, Defendant is entitled to judgment as a matter of law on all eight claims.[21]

### b.  No Evidence of Any Disparate Treatment in Detail Assignments

Even if a reviewing court were to disagree and determine that Plaintiff was qualified for a particular detail assignment that was open and available during the times in question, Defendant still would be entitled to judgment based upon Plaintiff's failure to show that any similarly situated Mail Processing Clerk outside of her protected class was treated more favorably.  To prove the fourth element of her failure-to-promote claims, Plaintiff must show that a similarly-situated person who was not in her protected class received the detail/promotion.  *See Seay v. Term. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003). A vague allegation that Plaintiff was never promoted is not sufficient.  Here, Plaintiff has no evidence that any comparator at all was placed into an available detail position for which Plaintiff had applied during the relevant time periods.[22]  Certainly, Plaintiff does not identify any Caucasian male Mail Processing Clerks in Cincinnati who were awarded details between January 2016 and January 2018 by any of the eight RMOs identified in

---

[21]As previously discussed, Plaintiff's ninth detail claim, dating to January 13, 2018, was not included in her 2018 EEO complaint and therefore was not properly exhausted.

[22]Plaintiff's complaint fails to even *allege* this component of her disparate treatment claims.

her federal complaint: Brian Bull, Jeffrey Knauer, Mark Wilson, Roosevelt Thompson, John Rachlow, Chris Bruno, Reginald Smithson or Chris Smith.

Rather than identifying anyone outside of her protected class, Plaintiff lists two employees, Charrele Hayes and Tanika Herndon, who she alleges were awarded details by RMOs Bruno and Knauer. However, both Hayes and Herndon are Black females. Therefore, they are not proper comparators for purposes of Plaintiff's disparate treatment claims, even if Plaintiff could prove that they were similarly situated and received detail assignments for which Plaintiff was both eligible and the better qualified candidate.[23] Also unlike Plaintiff, Hayes first submitted a Form 991 and sought a permanent supervisory position for which she was not selected. (Doc. 99-9 at 6; 99-12 at 6, stating that Hayes was placed in a 204 B "acting supervisor" detail; Doc. 99-23 at 7). Plaintiff never submitted a Form 991 or applied for a permanent position. Additionally, all identified RMOs testified either that they were not aware that Plaintiff had requested a detail and had no recollection of any such conversations, or that they were not the deciding officials for any details that Plaintiff may have pursued. (*See generally*, Report of Investigation ("ROI"), Doc. 69-5 at Page ID 2423-2466).[24] *Accord*, *Rapp v. General Motors Corp.*, 148 F.Supp.2d 924, 931 (N.D. Ohio 2001) (noting evidence that none of the decision-makers knew of the plaintiff or of her interest in the position, and that another employee "was

---

[23]Defendant concedes that Ms. Hayes obtained some form of 204 B detail on an unspecified date in "the beginning of 2018." (Doc. 91-7, Ex. G, at PageID 4455; *see also* Doc. 91 at 27). Plaintiff failed to administratively exhaust her only 2018 claim. Plaintiff also offers no evidence to suggest that Herndon was selected for a detail during any time period in which Plaintiff had applied. Herndon was an "acting supervisor" at the time Bruno arrived at the facility. (Doc. 99-23). Finally, Plaintiff offers no evidence that she was better qualified, other than asserting that neither Hayes nor Herndon attended the CAC. While RMOs were encouraged to consult the Skills Bank, attendance at the leadership conference was not a requirement for a detail assignment.

[24]While Defendant cites only to the "summary" of testimony in the ROI, Plaintiff has filed the EEO Affidavits of several of the RMOs as exhibits. Unfortunately for Plaintiff, the EEO Affidavits support Defendant's motion. (*See*, *e.g.*, Doc. 99-23 at 3-4).

informed of the position because of his relationship with [the manager], not because of any discriminatory animus for the Plaintiff.").

### 2. Plaintiff Cannot Prove Discrimination in Disciplinary Actions

Plaintiff also has failed to prove her prima facie claims of discriminatory discipline on the basis of her protected class. Plaintiff must show at a minimum: (1) that her employer took a materially adverse disciplinary action against her; and (2) that the discipline imposed was more severe than that imposed against similarly-situated employees outside of her protected classification.

### a. Lack of Materially Adverse Disciplinary Action

Plaintiff complains about: (1) a January 16, 2018 disciplinary "Letter of Warning" relating to overtime; (2) the issuance of a letter/notice for Plaintiff to report for an investigative interview in July 2018; (3) an August 17, 2018 Notice of Suspension for 7 days for "unsatisfactory attendance/AWOL"; (4) the scheduling of a pre-disciplinary (investigative) interview on September 7, 2018 relating to absences from work; (5) the March 6, 2019 issuance of a letter from Plant manager Glancy under the subject matter: "Inability to Perform the Duties of Your Position" warning that due to "regular absence from duty" Plaintiff "may be considered for removal"; (6) a March 18, 2019 Notice informing Plaintiff that she could be removed from her employment due to being on Leave Without Pay status since January 11, 2018; and (7) a final Notice of Separation dated April 3, 2019. (Doc. 1, ¶23(c)-(h) and ¶23(j)-(k); Doc. 65-6 at 17; Doc. 65-7).

Defendant is entitled to judgment because none of the referenced actions constitute a materially adverse change in the terms and conditions of Plaintiff's employment, such as a loss of pay, benefits, or other material harm. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876 (6th Cir. 1996). Take, for example, the directive to Plaintiff

23

to report for an Investigative Interview in July 2018[25] and subsequent pre-disciplinary interview in September 2018.  Interviews or investigations are not actionable discipline absent a loss of pay or demotion or formal disciplinary action.  *See Kuhn v. Washtenaw County,* 709 F.3d at 626.  Two additional actions – the March 6, 2019 letter from Plant Manager Glancy and the March 18, 2019 Notice - were mere "Notices" that had no contemporaneous impact on the terms and conditions of Plaintiff's employment.

Three actions – the Letter of Warning, the 7-Day Suspension, and the ultimate Separation Notice of April 3, 2019, arguably could have impacted the terms and conditions of Plaintiff's employment.[26]  However, pursuant to union grievance settlements, the January 2018 Letter of Warning was rescinded and expunged, as was the 7-day Notice of Suspension. (Docs. 97, 103, Undisputed Facts 27, 30; *see also*, *e.g.*, Doc. 89 at PageID 3868-3870; Doc. 89-1 at PageID 3866-3867).  Plaintiff later grieved the Notice of Separation, on grounds that Glancy had separated her prior to the 30 days stated in that Notice.  During the pendency of this lawsuit, that grievance also was resolved, with Plaintiff reinstated on February 29, 2020. The expungement of the referenced actions means that Plaintiff's status was restored with no change in any terms of employment.  Therefore, Plaintiff has failed to show she experienced any materially adverse action for purposes of her discrimination claims.  *See Tolbert v. Potter*, 2005 WL 1348986 (E.D. Mich. June 2, 2005) (holding that disciplinary warning letter that was later expunged pursuant to a union grievance was not a materially adverse employment action).

### b.  No Evidence of Disparate Treatment

---

[25]Plaintiff did not appear for the scheduled interview.

[26]Plaintiff argues that she was unable to return to work for more than a year after suffering injuries during an alleged co-worker "assault."  However, Defendant was awarded summary judgment on the "assault" claims and the basis for Plaintiff's absence is irrelevant to her remaining claims.

As with her failure-to-promote claims, Plaintiff also fails to identify any similarly situated comparator outside of her protected class who was not subject to the same discipline. Plaintiff does not even attempt to identify potential comparators for most actions, save for the Notice of Separation. As to the Separation issue, Plaintiff identified Ms. Gohi and Ms. Hargrave as two persons who had been absent from work without authorization for "extensive" periods of time. Once again, however, neither are proper comparators because both are Black females. In addition, the record reflects that Gohi was on leave without pay (LWOP) status for less than one year, from June 29, 2019 through February 23, 2020.[27]

In opposition to summary judgment, Plaintiff asks the Court to consider two newly identified Caucasian comparators, Lisa Lynch and Joe Fritz. Plaintiff did not identify either during discovery but now asserts that both were treated more favorably despite extensive absences. However, Defendant properly objects to Plaintiff's identification of new witnesses and evidence in response to summary judgment. Pursuant to Fed. R. Civ. P. 37(b)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Plaintiff's new identification of Ms. Lynch and Mr. Fitz at this date, without having previously supplemented her discovery responses or identified them as potential comparators at any time during discovery, is not substantially justified or harmless. Because Defendant had no opportunity to explore information regarding these two

---

[27]While on LWOP status, Gohi's position changed to General Expeditor. Defendant points out that Gohi's supervisor was Clarice Crutcher and Hargrave's supervisor was Mallie Thompson; neither of those supervisors are alleged to have been RMOs in *this* case.

individuals during the discovery process, Plaintiff is precluded under Rule 37(b)(1) from invoking them as newly identified comparators.

Even if Plaintiff were not precluded from invoking Ms. Lynch and Mr. Fitz as comparators, she has failed to demonstrate that they are similarly situated.   According to Plaintiff, Lisa Lynch was a Supervisor of Operations, not a Mail Processing Clerk. There is no evidence that she was off work for more than a year.  The sole record to which Plaintiff cites, an affidavit statement by Knauer, suggests only that Lynch was given a 7-day suspension for attendance issues; it does not refer to the length of her absence or who issued the discipline.  (Doc. 99-9 at PageID 4787).  Similarly, while Plaintiff asserts that Ftiz was off work for "an extensive amount of time," she does not allege that he was off for more than a year or identify his position, and her sole citation to the record offers no support for finding him to be a proper comparator.  (*See* Doc. 99-50, Labor email).

### C.  Defendant is Entitled to Judgment on All Retaliation Claims

Having determined that Plaintiff has failed to prove her prima facie case on any of her race, color, or gender discrimination claims, the Court next examines the same failure-to-promote and disciplinary actions in the context of Plaintiff's allegation that Defendant took such actions in retaliation for Plaintiff's filing of her 2016 EEO complaint.  In order to establish that the failure-to-promote and disciplinary actions were retaliatory, Plaintiff must show that she was (1) engaged in protected activity; (2) that the decisionmaker knew about her protected activity (3) that the actions were "materially adverse"; and (4) that there is a causal connection between her protected activity and the materially adverse actions.  *See Abbott v. Crown Motor Co., Inc*., 348 F.3d 537, 542 (6th Cir. 2003); *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 792 (6th Cir. 2000).  Defendant concedes that the filing of the 2016 EEO complaint was protected activity for purposes of

establishing the first element of her claim. However, Defendant persuasively disputes all other elements.

### 1. The Alleged Materially Adverse Actions

The definition of a "materially adverse" action differs in the retaliation context. Instead of proving a material change in the terms of employment, a plaintiff claiming retaliation need only show that "a reasonable employee" would have found the challenged action to be materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (holding that a 37-day suspension without pay was sufficient to support retaliation claim even though employee did not suffer economic harm because she was subsequently reinstated and given back pay); *see also Laster v. City of Kalamazoo*, 746 F.3d 714, 719 (6th Cir. 2014) ("The 'materially adverse action' element of a Title VII retaliation claim is substantially different from the 'adverse employment action' element of a Title VII race discrimination claim," quoting *Burlington,* 548 U.S. at 59 (additional citation omitted)).

Based upon the different perspective employed for a retaliation claim, the Court assumes that a reasonable jury could find the disciplinary actions to which Plaintiff was subjected to be materially adverse. However, the same cannot be said for the denial of details, because – as discussed above – Plaintiff simply has no evidence that she was denied any open or available detail for which she was qualified during the months in which she alleges that she was not promoted.

### 2. Knowledge of the Decisionmakers

Because Plaintiff has failed to show the existence of any open or available details, the knowledge of the RMOs who allegedly ignored her requests for details is arguably

immaterial.  For what it is worth, the RMOs identified by Plaintiff testified that they were not aware of Plaintiff's 2016 EEO proceeding.  (*See*, *e.g.*, Doc. 99-9 at PageID 4768 (Knauer); Doc. 99-23 at PageID 5309 (Bruno).  Plaintiff insists that genuine issue of material fact remains in dispute on the RMOs' "knowledge" due to "**serious** creditability [sic] issues" with their testimony. (Doc. 100 at 23, emphasis original).  Without citation to the record, she argues that Knauer, Bruno, Bull and Hill all "lied about their knowledge of Plaintiff's 2016 case" because all allegedly were "noticed by email of mediation and/or present at the June 26-27, 2018 EEOC Hearing."   (Doc. 100 at 24, PageID 5743).  However, even assuming some RMOs were copied on emails regarding the June 2018 hearing, that does not repudiate their testimony that they had no knowledge of the 2016 EEO complaint when it was filed, or at the time the alleged denial of details occurred in 2016 or 2017.  *See also, generally, Lacy v. Bentsen*, 859 F.Supp. 1039, 1043 (E.D. Mich.1993) ("Lacy's bare allegation of knowledge is insufficient to negate the sworn testimony of these two fellow employees").

Plaintiff has also failed to prove that the decisionmakers for any of the adverse disciplinary actions – all of which occurred in 2018 and 2019 - had knowledge of her 2016 EEO complaint.  Plaintiff does not dispute that Acting Plant Manage Andrew Glancy, who signed the March 6 Options letter, the March 18 Notice, and the April 3 Notice of Separation, had no knowledge of Plaintiff's 2016 EEO activity.  Instead, Plaintiff asserts that Glancy was manipulated by his subordinates.  Even assuming the acceptance of the "cat's paw" theory, Plaintiff has offered no evidence to support her otherwise speculative claim that Glancy was a mere conduit for the retaliatory animus of his subordinates.

### 3. The Lack of Causal Connection

Last, Plaintiff offers no evidence to support the critical "causal connection" element of her retaliation claims. "To demonstrate causal connection, a plaintiff is required to proffer evidence sufficient to raise the inference that his or her protected activity was a motivating factor for the adverse decision." *Arnett v. Myers*, 281 F.3d 552, 560-61 (6th Cir. 2002).

Traditionally, a private sector employee must show "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *University of Texas SW. Med Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). That standard requires showing that "his or her protected activity was a but-for cause of the alleged adverse action by the employer," *Id.,* 133 S.Ct. at 2534. Recent case law suggests that federal employees may be able to establish a causal connection if they can prove that retaliation played "any" role. *See Babb v. Wilkie*, 140 S. Ct. 1168 (2020) (analyzing similar statutory language under the Age Discrimination in Employment Act ("ADEA") and holding that federal sector employees may prove a prima facie case by showing that discrimination played "any" role in an adverse employment action); *Tonkyro v. Sec'y, Dept. of Veterans Affairs*, 995 F.3d 828, 833 and 835 (11th Cir. 2021) (holding that *Babb* established that retaliation claims under Title VII's federal-sector provision are not subject to the but-for causation standard).

Here, however, even if the Sixth Circuit were to hold that the retaliation need only constitute "a factor" rather than the "but-for" cause of the various adverse actions alleged, Plaintiff has come forward with no evidence at all to raise the inference that her filing of the 2016 EEO complaint was a motivating factor for the various actions of which she complains. *See Lacy v. Bentsen*, 859 F.Supp. at 1043 ("Even if Lacy could demonstrate

that [decisionmakers] knew of her prior EEOC activities, she has not produced any causal link between their purported knowledge of her discrimination claim and the subsequent adverse employment decision.").

For instance, because Plaintiff has no evidence that she was denied any open and available detail assignment, she cannot prove a causal connection exists for her failure-to-promote claims. In response to a query asking why she believes her prior EEO Activity was a factor, her EEO Affidavit offers only this conclusory statement:

> I continue to be denied with no just reason. I am overlooked intentionally and my requests are being ignored. Once management was made aware of my original EEO matter circa November 2015 I was harassed by upper management who tried to coherence [sic] me into dropping my original EEO. After this point management has been extremely abusive towards me.

(Doc. 99-14, PageID 4868).

The length of time that elapsed between the filing of her 2016 EEO complaint and any of the challenged disciplinary actions in 2018 and 2019 further undercuts her conclusory assertions that any of those actions were retaliatory. *See Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (finding a gap of four months between the protected activity and the adverse action to be insufficient to support an inference of retaliation).

### D. Plaintiff Has Failed to Show Pretext

Last, Defendant has articulated legitimate non-discriminatory reasons for both the failure-to-promote and disciplinary actions, and Plaintiff has failed to show that Defendant's stated reasons were a pretext for race, gender, or retaliatory discrimination. "Under the law of our circuit, a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the

employer's action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (internal quotation marks and additional citations omitted). The reference methods to show pretext merely reflect alternative ways in which a plaintiff can satisfy her ultimate burden to show that her employer made up reasons for its actions as a pretext for discrimination. *Id.*

### 1. No Pretext for Failure to Assign Plaintiff to Details

Defendant's reasons for failing to promote Plaintiff are straightforward: Plaintiff did not apply for any open and available details and no Mail Processing Clerks were assigned details by any of the identified RMOs during the relevant periods. Plaintiff offers no evidence that these stated reasons for "ignoring" her requests for details were pretextual. Instead, Plaintiff offers only conjecture. For example, she complains that the "RMOs did not follow through with the [Career Awareness] Conference's goal," and prioritize the selection of candidates from the Skills Bank list but instead "selected individuals to their liking, specifically individuals who submit to sexual demands." (Doc. 100 at ¶ 28). Plaintiff suggests that she was denied details as a pretext "for refusing to submit to her superiors' sexual advances…." (Doc. 100 at ¶ 31). Apart from the fact that this new argument is wholly conclusory, it does not support her claims that the denial of details was a pretext for the discriminatory animus *that is alleged in her complaint*. (*See* Doc. 1 at ¶¶ 18-21, alleging "Black" race, "Brown" color, and female gender).

Plaintiff's uncorroborated testimony, personal beliefs, and speculation that the failure to assign her to details was based upon some form of discriminatory animus or in retaliation for her 2016 EEO complaint is not sufficient to create a reasonable inference of pretext. *See Snyder v. Pierre's French Ice Cream Co.,* 589 Fed. Appx. 767, 771 (6th Cir.2014) (personal belief, conjecture and speculation are insufficient to support inference of age discrimination); *see also Sutherland v. Mich. Dept. of Treasury*, 344 F.3d 603, 623

(6th Cir. 2003) (affirming summary judgment where plaintiff offered only "unsupported speculation" to prove pretext); *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 585 (6th Cir.1992) ("denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient"); *Adams v. Tennessee Dept. of Finance and Admin*., 179 Fed.Appx. 266, 274, 2006 WL 1208060, at *7 (6th Cir. 2006) (affirming summary judgment where plaintiff offered only his own self-serving deposition, affidavits and emails to support his "bald[] assert[tion" of pretext); *Chappell v. GTE Prods. Corp.,* 803 F.2d 261, 268 (6th Cir.1986); a*ccord Guethlein v. Donahoe*, 913 F.Supp.2d 480, 488 (S.D. Ohio 2012); *contrast Taylor v. Geithner*, 703 F.3d 328, 339 (6th Cir. 2013) (holding that postal worker's evidence that she had applied for and been denied 52 positions within same time period in which she filed three discrimination complaints, with "complete temporal overlap in the rejection from these positions and the protected activity" was sufficient to support inference of pretext for retaliation).

### 2.  No Pretext for Disciplinary Actions

Defendant has further articulated nondiscriminatory reasons for the discipline it imposed.  The only action that does not relate to Plaintiff's extended absence from work beginning on January 11, 2018 and continuing through April 3, 2019 is the January 16, 2018 disciplinary "Letter of Warning" relating to Plaintiff's use of overtime.  However, Defendant has offered evidence that it issued the Warning based upon an honest belief that Plaintiff had worked overtime without authorization.  The fact that the suspension was subsequently rescinded pursuant to the settlement of Plaintiff's union grievance is not sufficient to prove pretext, particularly given the long time gap between the filing of the 2016 EEO complaint and the January 2018 date that the Letter of Warning was issued. *Contrast Strickland v. City of Detroit*, 995 F.3d 495, 511-12 (6th Cir. 2021) (holding that

where plaintiff became subject of intense investigation soon after filing an internal complaint could give rise to an inference of causal connection).

All of the remaining disciplinary actions about which Plaintiff complains relate to her long absence from work from January 2018 through April 2019 without proper documentation.  Plaintiff does not contest the fact that she was absent for over a year, but instead continues to argue that her absence was justified based upon a January 2018 incident with a coworker that she characterizes as an "assault."  Plaintiff's personal beliefs about the nature of the January 2018 incident are not directly relevant to Defendant's facially nondiscriminatory reasons for its actions, and do not prove pretext.  In addition, Plaintiff's claim for worker's compensation was denied (and not appealed), the EEO administrative judge rejected her 2016 EEO claim that that she was the victim of an "assault" (a decision that Plaintiff also failed to appeal), and this Court previously granted judgment to Defendant on the "assault" claim.

Plaintiff's lack of proof of pretext extends to the April 2019 separation from employment.  The April 3 Notice of Separation explains that Plaintiff's separation is based upon her failure to provide medical documentation that she was fit to return to full duty by the March 18 deadline.  (Doc. 69-10 at PageID 2549-2550; *see also* Doc. 91-6, Depo. of Richard Hill, Attendance Control Officer, explaining administrative separation under the relevant ELM provision).  Contemporaneous emails between Glancy (Acting Plant Manager), Richard Hill (Attendance Control Officer), Daniel Kelly (Attendance Control Officer), and Jay Schild (manager, Labor Relations) offer strong support for the separation decision as the culmination of a long process under the ELM policy, with no hint of pretext. (*See* Doc. 91-4).  Weeks earlier, on February 19, 2019, Defendant sent a letter Plaintiff asking for acceptable medical documentation regarding her inability to report to duty.

33

(Doc. 91-2).  When Plaintiff did not comply with that letter, Defendant sent the March 6 "options" letter, advising Plaintiff that she must provide adequate medical documentation by March 18, 2019 if she wished to return, and that she could be separated from employment if she did not.  Rather than timely providing the requested documentation, Plaintiff unequivocally informed Defendant, via letter dated March 15, 2019, that she would not be fit for duty by March 18, and did not "expect" to consult with her physician until "mid-April for further notice of my medical condition."  (Doc. 91-4 at PageID 4435). In light of Plaintiff's March 15 response to the options letter, Defendant's issuance of a Notice of Intent to Separate on March 18, 2019, followed by the April 3 Notice of Separation, was non-discriminatory.  (Doc 91-5, *see also* Doc. 69-10 at PageID 2549-2550).

An employer who terminates an employee who fails to follow an employer's expressed directions to submit paperwork has a legitimate and non-discriminatory reason for its action.  *McLaughlin v. City of Auburn Hills*, 2020 WL 4530435, at *11 (E.D. Mich. 2020) (holding that employer had demonstrated honest belief, even if wrong, that employee had failed to submit required documentation of her continuing disability); *see also Fuertes v. Ford Motor Co.*, 2009 WL 395452, at *8 (W.D.Ky.,2009) (holding that employer had articulated a legitimate, non-discriminatory reason for terminating employee for failing to submit the required medical paperwork to support his leave of absence, which employee failed to show was mere pretext for having filed an earlier EEOC complaint).  In an last-ditch effort to show pretext, Plaintiff points out that the ELM provision under which the Notice of Separation states only that an employee "may" be separated for being on LWOP status for more than a year.  However, Defendant has

shown that two other Mail Processing Clerks under Knauer's supervision also were issued Notices of Removal in 2019 for attendance issues. (Doc. 80, PageID 3698-99).

### V.    Conclusion and Order

Although the summary judgment standard requires that evidence … be viewed in the light most favorable to the nonmoving party, it does not require that all bald assertions, opinions, or even genuinely held beliefs asserted by the nonmoving party be adopted wholeheartedly by a court."   *Diaz v. Mitchell's Salon and Day Spa, Inc.,* Case No. 1:09–cv–882, 2011 WL 379097, *7 (S.D. Ohio 2011). Here, Plaintiff's subjective beliefs that the Defendant discriminated against her and retaliated against her are unsupported by any objective evidence and therefore are unavailing.

For the reasons stated herein, **IT IS ORDERED:**

Defendant's motion for summary judgment (Doc. 91) is **GRANTED.**  Defendant is entitled to judgment as a matter of law on all of Plaintiff's remaining claims.

*s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge